**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

BOBBY RAY COLLINS,                )
                                  )
     Plaintiff,                 )
v.                                )          No. 2:10-CV-172-JMS-WGH
                                  )
THOMAS WEBSTER, M.D., et al.,     )
                                  )
     Defendants.                )


**Entry Discussing Motion for Summary Judgment**

As used in this Entry, "Collins" refers to plaintiff Bobby Ray Collins, Reg. No. 27382-077, a Federal inmate currently incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania. Collins was confined at the USP in Terre Haute, Indiana ("USP Terre Haute") from August 8, 2007, through April 20, 2009. The defendants, Thomas Webster, Julie Beighley, and Michael Armstrong, all worked at the Federal Correctional Complex Terre Haute, Indiana ("FCC Terre Haute") during the time Collins was incarcerated there.

Collins alleges in the Second Amended Complaint [dkt. 35] that the defendants: 1) failed to diagnose and properly treat his January 5, 2009, right knee injury; 2) failed to properly treat his right hand injury with pain medications and a soft cast; and 3) improperly transferred him to another Bureau of Prisons' institution. Collins has opposed the motion for summary judgment [see dkts. 155-159, 161, 177, 180-182].

The defendants seek resolution of the claims alleged against them through summary judgment. For the reasons explained below the defendants' motion for summary judgment [148] is **granted in part and denied in part.**

**Standard of Review**

The motion for summary judgment in this civil rights action, as with any such motion, must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.

*Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (citations omitted). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372 (2007).

AIf the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party.@ *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## Statement of Material Facts

The undisputed material facts, viewed in the light most favorable to Collins, the nonmovant, are as follows:

<u>The Defendants</u>

Dr. Webster was the Clinical Director at the FCC Terre Haute. Dr. Webster was not assigned as Collins' primary care physician during the relevant times Collins asserts improper medical treatment. Dr. Webster never personally met with Collins or provided him with any medical treatment. Dr. Webster's only involvement with Collins' medical care was completely limited to administrative functions, *i.e.*, signing off on orders by treating mid-level medical providers assigned to FCC Terre Haute or adopting recommendations of attending physicians Collins saw in the community.[1] As the Clinical Director, Dr. Webster had no role in

---

[1] Collins contends that Dr. Webster was the assigned primary care physician during the relevant times that Collins was receiving improper medical treatment because Dr. Webster as the clinical director was responsible for the oversight of the clinical care provided at the institution. Pl.'s Memo at 4, Surreply at 2. In support Collins cites to various program statements, none of which support

decisions as to where inmates are housed, including decisions to place inmates in the Special Housing Unit ("SHU"). There is no evidence that Dr. Webster was involved in the administrative remedy process.[2]

Michael Armstrong was a Physician's Assistant ("PA") employed by the BOP and assigned to the FCC Terre Haute. As a PA, Mr. Armstrong had no role in decisions as to where inmates are housed, including decisions to place inmates in the SHU. Further, PA Armstrong had no involvement in Collins' transfer to the USP Lewisburg.

Ms. Julie Beighley is currently employed as the Health Services Administrator ("HSA") at the FCC Terre Haute. Ms. Beighley has been employed as the HSA since October 2006, and has been employed by the BOP since 1988. As the HSA, she has access to inmates' records, medical records, electronic data maintained on the BOP's SENTRY computer system and BOP Program Statements. Ms. Beighley's position as an HSA does not involve providing medical care to inmates. Specifically, as an HSA, she is responsible for implementing and directing the administration of the institution's Health Service Department. Ms. Beighley's duties include administrative personnel supervision, staff scheduling oversight, procurement, fiscal management, housekeeping and maintenance and records supervision. Ms. Beighley has authority and responsibility only for non-clinical matters related to the Health Services Department.

Ms. Beighley had limited personal knowledge of, or involvement with Collins. As an HSA, Ms. Beighley does not make clinical decisions such as denying consults, testing, or medical treatment to inmates. Ms. Beighley makes only administrative decisions. Accordingly, Ms. Beighley has never participated in any medical decision or recommendation regarding Collins.[3] Additionally, as the HSA, Ms. Beighley does not have the responsibility or authority to deny recommended medical treatment for an inmate; only the Clinical Director and Utilization Review Committee have the authority to deny recommended medical treatments. As the HSA, Ms. Beighley has no role in the decisions as to where inmates are housed, including decisions to place

---

the conclusion that Dr. Webster was in fact Collins' primary care provider. As a general matter, Collins spends considerable effort describing how certain actions or inactions by the defendants allegedly violate Bureau of Prison program statements. While program statements and policies may be relevant, it is well established that violations of regulations or policies or procedures do not rise to the level of a *Bivens* violation. *See, e.g., Davis v. Scherer*, 468 U.S. 183, 194 (1984); *Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986). Accordingly, program statements are only included in the statement of facts to the extent they are material to the dispositive issues.

[2] Collins asserts that Dr. Webster ignored administrative grievances and failed to have a URC consider his situation. Pl.'s Memo at 7. But there is no evidence upon which a reasonable trier of fact could conclude that Dr. Webster was aware of Collins' administrative grievances.

[3] There is no evidence to support Collins' claim that Beighley had a duty to direct the medical care providers to schedule surgery, prescribe a soft cast or medications.

inmates in the Special Housing Unit. Additionally, Ms. Beighley had no involvement in Collins being transferred to the USP Lewisburg.

<u>Treatment of Collins' Right Knee and Hand</u>

Dr. Webster led a utilization review committee[4] on February 14, 2008, which approved the in house magnetic resonance imaging ("MRI") exam for Collins' right knee. Collins received an MRI of his knee on September, 2008.[5]

Collins further injured his right knee on January 5, 2009. Specifically, Collins twisted his right knee on the jogging track, he heard a popping noise and had a limited range of motion. Collins reported to institution health services the same day for complaints of right knee pain. Notes indicate that there was swelling of the right knee area. X-rays of the right knee were requested by the attending nurse after consulting with PA Armstrong.[6] Collins was given a prescription for ibuprofen for the swelling and pain, was ordered crutches and was further advised to ice the area to reduce swelling and pain.

Collins was seen by a mid-level provider or "MLP"[7] on January 14, 2009, for complaints of continuing right knee pain. The x-ray results showed a mild effusion, but were otherwise negative.

Armstrong saw Collins on January 30, 2009, for complaints of right knee pain and pain in his left ear. Ear drops were ordered for his left ear at this time. Armstrong did not provide treatment for Collins' right knee on January 30, 2009, nor did Armstong request a physical exam of Collins by an institution Physician, put in a request for Collins to see a specialist, or seek the formation of a URC or schedule Collins for an MRI.

---

[4] Per Program Statement 6031.01, "Patient Care," every institution shall have an established Utilization Review Committee ("URC") which is chaired by the Clinical Director of the institution. As chair of the committee, the Clinical Director is the final authority for all decisions of the committee. Other committee members can include: the HSA, medical trip coordinator, health care provider(s) directly involved in reviewing cases, Director of Nursing (if applicable) and a chaplain or social worker.

[5] Collins states that the MRI took place on April 24, 2008, but the citation provided to support that assertion does not reflect what date the MRI occurred. See 156-2 at p. 12 (Exh. B at p. 2) (record reflects that MRI Scan was refused on April 22, 2008, and record was co-signed on April 24, 2008). In any event, the exact date of the MRI is not material. It is undisputed that the MRI occurred in 2008, prior to the January 5, 2009, knee injury.

[6] Mr. Armstrong asserts that he was not the mid-level provider ("MLP") involved with this visit, but for the purposes of summary judgment the facts are viewed in the light most favorable to Collins.

[7] PA Armstrong was considered a MLP, but a general reference to a MLP is not intended to refer to PA Armstrong unless he is specifically identified. PA Armstrong was not the MLP involved with the January 14, 2009, evaluation.

On February 4, 2009, Collins received arthroscopic surgery to his right knee by Dr. Burkle, a non-BOP orthopedic surgeon. On that same day, Collins was seen as a follow-up encounter to the arthroscopic knee surgery by institution medical staff. The surgeon recommended prescribing Tylenol with Codeine to Collins, which was ordered by an institution staff physician.

No MRI was taken between the date of Collins' injury, January 5, 2009, and the surgery. The February 4, 2009, surgery was scheduled as a result of the MRI taken in September, 2008.  Dr. Webster testified that there was no medical reason to schedule an additional MRI before the scheduled surgery to determine the extent or scope of any additional injury that occurred on January 5, 2009. The extent of any injury that may have occurred on January 5, 2009, could be determined by examination by the contract specialist during the arthroscopic surgery. It was anticipated that the appropriate treatment, if any was required, could and would be provided at that time by the contract specialist. Thus, there was no reason for a Utilization Review Committee to consider whether Collins should have received an MRI after January 5, 2009, and before February 4, 2009.[8] In addition, Dr. Webster contacted Dr. Burkle, the contract doctor who was going to be doing the knee procedure, to inform Dr. Burkle that "Plaintiff had just had a recent injury to the knee." Pl.'s Response at 7. *See also* Declaration of Bobby R. Collins (Dkt. 157) (Dr. Burkle "stated to me personally that he had been informed of the recent injury . . . ." by Dr. Webster).[9]

Collins was seen on February 7, 2009, by an MLP and a nurse changed the dressing to his knee. Incision was noted as intact, with minimal dried blood on the old dressing.

Physical therapy records dated February 10, 2009, indicate that swelling was expected around Collins' right knee. Short term and long term physical therapy goals were noted. Collins' use of a wheelchair was ended by the physical therapist because "it would be more beneficial for him to begin weight bearing through the RLE. Therefore, the wheelchair was taken from him and he was issued a pair of auxiliary crutches."

On February 10, 2009, a health services clinical encounter occurred. Collins was found on the waiting room floor, monitored and treated for dizziness. Dkt. 156-

---

[8] Neither Ms. Beighley nor Michael Armstrong had any responsibility for, or ability to, form a URC in early 2009 or at any time during their employment.

[9] Collins argues that the medical care he received was inadequate because the right knee injury of January 5, 2009, should have been evaluated by a doctor or with an MRI prior to the arthroscopic procedure which occurred on February 4, 2009. There is no evidence to support the Collins' claim that the course of treatment employed by the **defendants** was inadequate or that additional diagnostics were constitutionally necessary prior to the arthroscopic procedure.

2 at p. 28.[10] When Collins fell, he fractured his right hand. Collins was treated by Christopher McCoy, RN. The treatment notes reflect that Nurse McCoy consulted with PA Armstrong on the phone. No treatment was provided for Collins' right hand and he was sent back to his unit on crutches.

Collins visited health services on February 11, and 12, 2009, to attempt to seek evaluation and treatment of his right hand, but no care was provided.

Physical therapy records dated February 12, 2009, reflect Collins had not been icing his knee as previously instructed. Collins states that he was never instructed to ice his knee. It was noted at this time that Collins was progressing well with his physical therapy treatment. Collins was also instructed on exercises that should be done on his own.

Armstrong saw Collins on February 13, 2009, for Collins' February 10, 2009, fall and related injury to his right hand. Examination of Collins' hand suggested a closed fracture of the metacarpal. Tylenol with Codeine and Ibuprofen were prescribed. A request for an Orthopedist consult was submitted. Additionally, Collins was placed on a call-out to be further evaluated and was also placed on convalescence.[11]

An Administrative Note dated February 25, 2009, indicated that Nurse Christopher McCoy inquired whether Collins needed a soft splint until he was seen by Dr. Burkle. Dkt. 156-2 at p. 44. PA Armstrong told McCoy that he did place Collins' in a soft splint. Collins was not wearing the soft splint when he spoke with Nurse McCoy. The parties dispute whether Collins was provided with a soft cast or splint.

Dr. Burkle, an orthopedic surgeon, signed a note dated March 2, 2009, in which he states that Collins has a fracture in excellent position that needs a soft cast for four weeks. Dkt. 156-2 at p. 43. Collins testified that PA Armstrong did not apply a soft or hard splint or cast on Collins' right hand.

An Administrative Note dated March 3, 2009, indicates the request to have Collins' right wrist evaluated by an orthopedic surgeon was approved. Also, an Administrative Note dated March 4, 2009, ordered an orthopedic surgery evaluation of Collins' fractured metacarpal as soon as possible.

---

[10] Collins submitted this document to support his claim that he went to health serves requesting treatment for his fractured right hand on February 10-12, 2009, but this document does not support such a claim.

[11] Collins disputes Armstrong's assertion, supported by the medical record, that Armstrong submitted a request for an orthopedic consultation for Collins on that date. Contrary to Collins' assertion the evidence he submitted in support of his claim reflects that an orthopedist consultation was requested. Dkt 156-2 at p. 42 (request), and 156-2 at p. 33 (schedule evaluation).

Physical therapy notes from March 4, 2009, indicate Collins was experiencing significant atrophy in his right quad and calf based on him not bearing his full weight while walking. Collins was advised the atrophy would improve with increased weight bearing.

Collins was seen on March 5, 2009, by a MLP, Timothy Tabor, for complaints of lower extremity pain. It was noted that Collins' knee was slightly swollen; however, he refused to have the fluid drained from his knee, which would have assisted in relieving some of the pain. The MLP noted that Collins was ambulating with use of crutches and that Dr. Burkle recommends not casting his right hand due to three weeks passing since the fracture. Dkt. 149-3 at p. 22.

An Administrative Note dated March 19, 2009, indicates that the outside surgeon recommended Collins be given pain medication prior to physical therapy three times per week. The institution staff physician adopted the outside surgeon's recommendation and ordered Oxycodone to be taken by Collins through the pill-line (2 tablets orally three times per week prior to physical therapy).

On March 11, 2009, Collins filed a request for administrative remedy stating that he had not received treatment for his hand fracture and that he needed renewal of his pain medication. In response to this grievance, Collins was informed by Warden Marberry that Collins' treatment has been discussed, narcotic pain medication is not indicated and that he has been scheduled to be seen by an orthopedic surgeon. Dkt. 156-1 at p. 10-11.

Mr. Armstrong saw Collins on March 25, 2009, for complaints of right knee pain. No new orders were written.

Mr. Armstrong saw Collins again on April 9, 2009, for complaints of knee pain. No new orders were written.

Ms. Beighley recalls Collins approaching her during mainline with questions about his hand. She further recalls asking his Primary Care Provider Team ("PCPT") if he needed to be seen and/or prescribed medications; however, that was the extent of Ms. Beighley's involvement with Collins.[12]

---

[12] Collins claims that Ms. Beighley told him he would not receive treatment while on the F2 Programming Unit. The court assumes the F2 Programming Unit is the same as the SHU. The record reflects this is not true. FCC Terre Haute has a program specifically set up for the inmates housed on the F2 Programming Unit where they may contact medical staff for treatment in one of two ways: 1) they can put "sick call" slips on their doors so when medical staff are passing out medications, the sick call slip can be addressed; and 2) inmates can submit a "sick call" slip into the mailbox provided to them on the Unit. Medical Staff are in the Unit three (3) times per day to distribute medications. Further, the mailbox is emptied daily at approximately 5:30 a.m. The inmate

On April 10, 2009, Collins' was transferred to the Special Housing Unit.[13]

On April 16, 2009, Kimberly Klink, MS, FNP, discontinued Collins' physical therapy and the pain narcotics which were prescribed to be taken three times a week prior to physical therapy. Ms. Klink's administrative note of that date states "inmate is no longer on physical therapy while in the SHU. Will discontinue narcotics." Dkt. 156-2 at p. 18.[14] Dr. Webster co-signed the note on April 17, 2009.

Collins was transferred to USP Lewisburg on April 20, 2009. The medical staff at USP Lewisburg ordered an orthopedic surgery evaluation on May 6, 2009. Collins ultimately had a second surgery on November 2, 2011, described in part as "arthroscopy of right knee with ACL reconstruction utilizing tendon allograft . . . ." Dkt. 156-2.  Collins received a cast for his right hand on May 21, 2009.

None of the defendants were involved in Collins' transfer to the USP Lewisburg.[15] A review of Collins' transfer records in SENTRY indicate that he was transferred on April 20, 2009, via airlift to USP Lewisburg from FCC Terre Haute. This was a routine airlift under routine inmate transport conditions. There are no indications that the medical department was involved. Under Program Statement P6270.01, Medical Designations and Referral Services for Federal Prisoners, the stated purpose and scope is "[t]o specify procedures and criteria for transporting

---

is then scheduled to see their assigned Physician's Assistant. The F2 Unit, where Collins resided, is escorted to the Medical area every other Friday. Should emergencies occur, medical staff address the inmate's concern on their Unit or the institution is secured and the inmate is taken to Medical at the time of the medical emergency. There is no evidence to suggest that Collins was not aware of how medical treatment could be obtained on the SHU.

[13] Neither side presents evidence upon which the court can rely to establish the date that Collins was placed in the SHU. This is inconsequential because this fact is included only for clarity. The April 10, 2009, date comes from the allegations in the second amended complaint.

[14] Collins' states that his crutches were confiscated and he was denied a wheelchair, but there is no evidence cited which supports this statement.

[15] Collins asserts that Defendants Beighley and Webster were involved with his transfer. Pl.'s Memo at 21-22. There is no evidence to support this claim. Collins acknowledges that he was "placed on a regular routine commercial air flight" (Dkt. 155-8), Collins asserts that Dr. Webster was involved with the transfer of Collins, because Collins asserts that Dr. Webster was required to, but failed to certify a form, BP-S659.060, stating that Collins was in stable condition. Pl.'s Memo at 5. There is no evidence or assertion that Collins was not stable at the time of the transfer and Collins presents no admissible evidence that the form he contends must have been filled out actually applied to his situation. Collins submitted the inmate intra-system transfer form used in his April 20, 2009 transfer to USP Lewisburg. This form contains Collins health information and was signed by Ndife, Z MLP, see dkt. 156-2 at p. 64. There is no evidence that any of the defendants were involved in Collins' transfer. Even if Webster or Beighley were involved in the transfer there is no evidence that such transfer was in any way unconstitutional. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)("[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.").

inmates who require medical care. The Central Office Medical Designator, Office of Medical Designations and Transportation (OMDT) makes medical designations." Collins cites to this program statement in his response, however, this would not apply to him as he did not require a medical transport, nor was he being designated to a Federal Medical Center.

Collins' Motion for Additional Discovery

The plaintiff's motion pursuant to *Federal Rules of Civil Procedure* 56(d) [180] is **denied.**[16] Pursuant to Rule 56(d) if the court finds that a nonmovant (such as Collins) cannot, for specified reasons, present facts essential to justify its opposition the court may issue an appropriate order, such as allowing additional time to take discovery. In this instance, no relief is appropriate because the documents requested by Collins would not support any facts essential to justify his opposition to the motion for summary judgment. In other words, there is no plausible basis to conclude that the production of the requested materials would change the outcome of the pending motion for summary judgment. In addition, the court notes that given Collins' myriad filings (which we have been accepted as responsive even though some are untimely and submitted in improper serial form) the court finds no impairment of his ability to respond.

## Discussion

Collins alleges that the defendants 1) failed to diagnose and properly treat his right-knee injury, 2) failed to provide a soft-cast and additional pain medication for his fractured right hand, and 3) transferred Collins in an unstable condition. All in violation of his constitutional rights.

Collins' complaint is brought pursuant to the theory recognized in *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 38 (1971). The court has jurisdiction over such claims through 28 U.S.C. ' 1331. A prerequisite to maintaining an action under ' 1331 is that the plaintiff "must allege a violation of the United States Constitution or a federal statute." *Goulding v. Feinglass,* 811 F.2d 1099, 1102 (7th Cir.), *cert. denied,* 107 S.Ct. 3215 (1987). The constitutional violation pertinent to this action is the Eighth Amendment.[17]

---

[16] In making this determination the court considered the plaintiff's filings at docket numbers 181, 182, 184-190.

[17] **The second amended complaint references a due process claim. The parties do not discuss a due process claim in their summary judgment briefing. Because Collins' claims are sufficiently based on the protections afforded by the Eighth Amendment to the Constitution, there is no occasion to invoke the important but limited protections of due process and equal protection.** *Albright v. Oliver,* 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim.") (plurality opinion of Rehnquist, C.J.) (internal quotations omitted).

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official may be held liable under the Eighth Amendment for acting with deliberate indifference to inmate health or safety only if the prison official knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to avoid it. *Id.* at 847. Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To state an Eighth Amendment claim, two requirements must be met. The court must determine whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and whether the prison officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). A deliberate indifference claim contains both objective and subjective elements. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).

The defendants' argue that they are entitled to summary judgment as to the plaintiff's Eighth Amendment claims because Collins cannot show that any of the defendants acted with deliberate indifference to his health, safety or treatment. Collins disagrees. Each of Collins' specific claims is discussed below.

## A.    Medical Care

To succeed on a deliberate indifference claim in the medical care context, a plaintiff must (1) demonstrate that his medical condition is "objectively, sufficiently serious," and (2) demonstrate that the defendant acted with a "sufficiently culpable state of mind." *Holloway v. Delaware County Sheriff*, 2012 WL 5846289, *7 (7th Cir. Nov. 20, 2012) (quoting *Farmer*, 511 U.S. at 834). An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez*, 111 F.3d at 1373.

For the purpose of this motion the defendants' argue that even if Collins' medical needs are considered serious, Collins cannot show deliberate indifference on the part of the defendants. Before a doctor will be found deliberately indifferent, the plaintiff must show subjective indifference. *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008). "The nub of this subjective inquiry is what risk the medical staff knew of and whether the course of treatment was so far afield as to allow a jury to infer deliberate indifference." *Id.*; see also *Edwards v. Snyder,* 478 F.3d 827, 830-31 (7th Cir. 2007) ("The subjective component of a deliberate indifference claim requires that the prison official knew of 'a substantial risk of harm to the inmate and disregarded the risk.'"). A court will "examine the totality of an inmate's medical care when determining whether prison officials have been deliberately

indifferent to an inmate's serious medical needs." *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

### 1. Knee Injury

With regards to his knee injury, Collins argues that he had the right to be evaluated by a doctor, specialist or to be scheduled for a MRI exam prior to his February 4, 2009, surgery. Collins argues that there "was more than enough medical reason to do a consultation request/schedule evaluation and treatment for the right knee." Dkt. 156 at p. 6. Collins specifically alleges that the defendants are liable to him under *Bivens*, because a utilization review committee was not convened after his knee was injured on January 5, 2009.[18]

Collins did, however, receive medical treatment for his knee. When Collins complained about his knee, it was x-rayed. Collins received an arthroscopic knee surgery on February 4, 2009. Collins' knee complaint was expected to be addressed during the arthroscopic surgery that was scheduled before the date of the additional injury he complains of, January 5, 2009. There was no medical reason to schedule an additional MRI before the scheduled surgery to determine the extent or scope of any additional injury that occurred on January 5, 2009. Dr. Webster expected that any injury that may have occurred on January 5, 2009, could be determined by examination by the contract specialist during the arthroscopic surgery. It was anticipated that the appropriate treatment, if any was required, could and would be provided at that time by the contract specialist. Dr. Webster even contacted the outside doctor who was going to perform the arthroscopic surgery about the recent injury, before the procedure occurred.

With the benefit of hindsight, Collins can argue that if he had received an MRI after his January 5, 2009, injury but before his previously scheduled surgery, his damaged ACL could have been treated sooner. The question, however, is not whether the treatment prescribed could have been more effective, but whether the defendants were deliberately indifferent to Collins' knee injury. There is no evidence that any defendant had a sufficiently culpable state of mind with regards to the medical care provided for Collins' knee to satisfy the subjective element of a deliberate indifference claim. In addition, there is no evidence that the course of treatment was so far afield as to allow a jury to infer deliberate indifference

---

[18] To the extent this claim is based upon an alleged failure to follow Bureau of Prisons policy, it does not rise to the level of a claim under *Bivens*. *Miller v. Henman*, 804 F.2d 421, 424-26 (7th Cir. 1986) (items not promulgated under the Administrative Procedures Act or published in the Code of Federal Regulations do not create legally enforceable entitlements).

### 2.     Fractured Hand

Collins alleges that defendants Armstrong, Beighley and Webster were deliberately indifferent to his hand injury. Collins fractured his hand on February 10, 2009. Collins reported that his hand was injured for three days prior to receiving treatment. PA Armstrong examined Collins on February 13, 2009, and suggested that Collins had a closed fracture of the metacarpal. PA Armstrong provided Collins with pain medications and a request for a consultation was submitted. Collins insists he continued to complain that he needed additional pain medication for his hand, but was not provided with any. In addition, Collins testified that he needed, but was never provided a splint. The evidence cited by the defendants raises genuine issues as to whether PA Armstrong provided a splint, as he maintains. The first treatment record does not show a splint was provided. Collins eventually received a cast at USP Lewisburg.

Based on the current record, if Collins' version of the facts is accepted, PA Armstrong can be found to have violated Collins' clearly established Eighth Amendment rights by purposefully denying him a soft cast or splint and forcing him to use his fractured hand to walk with crutches and without pain medication. "[A] fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (quoting *Farmer*, 511 U.S. at 842). There are simply too many factual disputes related to Collins' requests for treatment of his right hand and the treatment that PA Armstrong provided or failed to provide to resolve this claim on summary judgment.

There is, however, no evidence that Beighley or Webster were deliberately indifferent to Collins' fractured hand. In addition, Beighley and Webster cannot be liable merely because of their positions. In a *Bivens* claim, there must be individual participation and involvement by the defendant. *Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir. 1994). Supervisory liability may be found if the supervisor approves of the subordinate's conduct. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). However, to be liable, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* (*quoting Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)). Neither Webster nor Beighley had direct involvement with Collins' medical care, including the treatment of his hand fracture and they cannot be held responsible merely because of their positions as Clinical Director and Health Services Administrator. There is no evidence sufficient to conclude that they were personally involved in any action that rises to the level of a *Bivens* claim, or knew of any such conduct, approved it, condoned it, or turned a "blind eye" to it. Webster and Beighley are entitled to summary judgment on the claim of deliberate indifference as to Collins' fractured hand.

### 3.     Termination of Certain Pain Medication

Collins' contends that the defendants should be liable under *Bivens* in connection with a termination of a prescription for a pain medication. The pain medication in question was not terminated by any of the named defendants; it was terminated by Ms. Klink. Once Collins was transferred to the SHU and physical therapy could not be provided because of that placement, the narcotic was discontinued by Ms. Klink. The prescription had been written for Collins to receive the medication prior to participation in physical therapy. None of the named defendants were directly involved in the discontinuance of the narcotic pain medication. This alleged violation spans no more than 4 days. The order to discontinue the narcotic pain medication is dated April 16, 2009; Collins was transferred on April 20, 2009. In light of these facts, Collins' assertion that his constitutional rights were violated because he was not given narcotic pain medications, which were to be given before physical therapy, when he was not going to be receiving physical therapy, is rejected. The defendants are entitled to summary judgment on this claim.

### B.     Transfer to USP Lewisburg

All defendants are entitled to summary judgment being entered in their favor in connection with Collin's transfer to another institution. Federal prisoners may be transferred "from one place of confinement to another at any time for any reason whatsoever or for no reason at all." *Brown-Bey v. United States*, 720 F.2d 467, 470 (7th Cir. 1983). Further, 18 U.S.C. § 3621(b) states: "The Bureau of Prisons shall designate the place of the prisoner's imprisonment." *See McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").

Collins asserts that Dr. Webster and Ms. Beighley should be liable based upon his assertion that his transfer falls within the scope of Program Statement 6270.01. This claim is grounded upon a misunderstanding of an alleged need for a medical clearance before Collins was moved. There was no evidence of any such policy violation. Collins was transferred on April 20, 2009, via airlift to USP Lewisburg from FCC Terre Haute. This was a routine airlift under routine inmate transport conditions. There are no indications that the medical department was involved. Under Program Statement P6270.01, Medical Designations and Referral Services for Federal Prisoners, the stated purpose and scope is "[t]o specify procedures and criteria for transporting inmates who require medical care. The Central Office Medical Designator, Office of Medical Designations and Transportation (OMDT) makes medical designations." Collins did not require a medical transport, nor was he being designated to a Federal Medical Center.

Additionally, as was noted above, even if a violation of a BOP policy occurred, it would not rise to the level of a *Bivens* complaint. Further, based upon Collins' medical records, his condition was not such as would have prevented a transfer for medical reasons.

### C.    Qualified Immunity

The doctrine of qualified immunity protects government officials performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When deciding a defendant's entitlement to qualified immunity, a court must consider two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established, in the sense that, in the specific factual context of the case, it would have been clear to any reasonable official in the position of the defendant that his conduct was unlawful in the situation he confronted. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). *See also Pearson v. Callahan*, 555 U.S. 223 (2009) (either question may be decided first).

All defendants are entitled to qualified immunity as to any allegation that they were required to convene an URC, or that they were required to fill out a particular form before Collins was transferred to another institution. There is no basis to conclude that Collins' constitutional rights were clearly violated "by Defendants not coming together for a utilization review committee" or for failing to certify Collins' medical status before transfer. Pl's Memo at 33-24.

Webster and Beighley are also entitled to qualified immunity as to the claims of deliberate indifference pursuant to the Eighth Amendment because the facts, taken in the light most favorable to Collin's, show that Webster and Beighley's conduct did not violate Collins' constitutional rights.

Qualified immunity cannot be granted to PA Armstrong on the claim of deliberate indifference to Collins' hand injury. If Collins' version of the facts is accepted, PA Armstrong can be found to have violated Collins' clearly established Eighth Amendment rights by purposefully denying him a soft cast and forcing him to use his injured hand to walk with crutches and without pain medication.

### Conclusion

The motion for summary judgment [148] is granted in its entirety as to Beighley and Webster and granted in part as to PA Armstrong. PA Armstrong is entitled to summary judgment as to all claims, except for the claim that he was

deliberately indifferent to Collins' fractured hand and associated pain in violation of the Eighth Amendment. This claim of deliberate indifference against Armstrong is the sole remaining claim for trial.

The "motion pursuant to Fed. R. Civ. P. 56(d)" [180] is **denied.**

The **magistrate judge is requested** to conduct a telephonic status conference to discuss the logistics of trial, including specifically, plaintiff's participation by videoconferencing.

No partial final judgment shall issue at this time as to the claims resolved in this Entry.

**IT IS SO ORDERED.**


Date: 01/30/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution:**

**BOBBY RAY COLLINS**
**27382-077**
**LEWISBURG U.S. PENITENTIARY**
**Inmate Mail/Parcels**
**P.O. BOX 1000**
**LEWISBURG, PA 17837**

**Jeffrey L. Hunter**
**UNITED STATES ATTORNEY'S OFFICE**
**jeff.hunter@usdoj.gov**